IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN CARBONE and RYAN ADKINS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Limited Run Games, Inc.,<br><br>Defendant. | Civil Action No.: 2:24-cv-08861-NJC-JMW<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs John Carbone, and Ryan Adkins ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Limited Run Games, Inc. ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of Plaintiffs' counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on Plaintiffs' personal knowledge.

## NATURE OF THE ACTION

1.  Defendant Limited Run Games, Inc. ("Defendant") owns and operates its online and mobile applications ("Apps"), including limitedrungames.com (the "Website"). Through its Website and Apps, Defendant sells and/or delivers audiovisual materials, such as video games containing cinematic cutscenes.

2.  Unbeknownst to Plaintiffs and the Class Members, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user or audiovisual content purchased—to unauthorized third parties without first complying with the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

## JURISDICTION AND VENUE

3.  This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs'

claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class Members; (2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

4. This Court has personal jurisdiction over Defendant because it conducts substantial business within New York, including the sale, marketing, and advertisement of its Website and products. Furthermore, a substantial portion of the events giving rise to Plaintiffs' claims occurred in this State.

5. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Defendant resides in this District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## PARTIES

6. Plaintiff John Carbone is a citizen of New York, who resides in Hauppauge, New York. Plaintiff Carbone purchased a video from Defendant's Website within the last two years of filing of this Complaint.

7. Plaintiff Ryan Adkins is a citizen of Warren, Michigan. Plaintiff Maurer purchased a video from Defendant's Website within the last two years of filing of this Complaint.

8. Throughout Plaintiffs' interactions with Defendant's Website, Plaintiffs maintained and used Plaintiffs' Facebook account from the same browser Plaintiffs used to purchase the video game from the Website, which contained cinematic cutscenes.

9. Pursuant to the systematic process described herein, Defendant caused Plaintiffs video game purchase to be sent along with Plaintiffs' personally identifiable information ("PII")

2

to Facebook and upon information and belief, other third parties, without Plaintiffs' knowledge or consent each time Plaintiffs requested and viewed video content and video games sold through the Website.

10. Plaintiffs never consented, agreed, nor permitted Defendant to disclose Plaintiffs' PII and viewing information to Facebook or other third parties and certainly did not do so for purposes violative of the VPPA.

11. Defendant Limited Run Games, Inc. is a North Carolina corporation with its principal place of business located in Apex, North Carolina.

## GENERAL ALLEGATIONS

### *History and Overview of the VPPA*

12. The impetus for the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> "It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong".

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

13. In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that]

3

allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

14. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

### *The VPPA and Video Games*

15. The VPPA covers "prerecorded video cassette tapes or similar audio visual materials," see 18 U.S.C. § 2710(a)(4), and Congress intended that to include materials like "laser discs, open-reel movies, or CDI technology[.]" *See* S. Rep. 100-599.

16. In 1986, "Philips and Sony announced that they were developing standards for a new medium based on the CD and CD-ROM technology."[1] This new format, known as Compact-Disc Interactive, or CD-I, promised to "make it possible to store audio, video, text, computer-generated images, or any combination of these on a compact disc."[2]

17. In 1991, that vision turned into reality. Philips introduced a new console, the Philips CDI 910, which "play[ed] cinema-quality computer games, educational programs, movies, and other multimedia products that combine video, audio and text features in an

---

[1] *See* Scott A. Stewart, *Videodiscs in Healthcare: A Guide to the Industry*, THE MEDICALDISC REPORTER (1990), *archived at* https://tinyurl.com/44ypcaht.
[2] *See* ENCYCLOPEDIA OF LIBRARY AND INFORMATION SCIENCE 98 (1992), *archived at* https://tinyurl.com/mt2vutat.

4

interactive rather than a play-only mode."[3] The new console played games like "Voyeur," for example, which was "a kind of high-tech version of Clue[,]" allowing users to "make decisions for characters and even change the outcome of the mystery."[4]

18. The Philips CDI 910 was initially a joint project between Philips and Sony, but "mounting conflicts resulted in a parting of ways."[5] That would prove advantageous for Sony. The Philips CDI 910 ultimately underperformed, receiving only a lukewarm response from consumers, but "its arrival cemented the CD-ROM as a medium for entertainment beyond the computer[,]"[6] and that same year, Sony unveiled its own console, the "Play Station," which used a CD-ROM drive to "play videogames as well as other forms of interactive entertainment, as was considered important at the time."[7]

19. Even before CD-I and CD-ROM, however, laser discs were used for video games and other interactive content. As early as 1981, laser discs "permit[ted] the viewer to not only manipulate the programming, but to interact with the material – play games, take quizzes, adjust pacing and repeat sections as desired."[8] During that same period, VHS tapes could also contain interactive content, like the television series "Captain Power and the Soldiers of the Future," which used "video game technology" to create an interactive experience, emitting "a signal, encoded in the television film, that both activates and responds to light rays emitted by the toy – a jet aircraft with a pistol grip – when the user pulls the trigger."[9]

---

[3] Patrick Oster, Philips's *Multimedia Makeover; Dutch Electronics Firm Escapes Crisis, but Can It Compete Globally?*, WASH. PO. (Oct. 26, 1994), *archived at* https://tinyurl.com/4xwnausj.
[4] David Elrich, *Interactive Video: Armchair Activities*, N.Y. TIMES (Dec. 9, 1993), *archived at* https://nyti.ms/3Wp2wkZ.
[5] IGN Staff, *History of the PlayStation: The greatest story ever told*, IGN (Jun. 21, 2012), *available at* https://tinyurl.com/25245e9t.
[6] *Id.*
[7] *Id.*
[8] Myron Berger, *High-Tech Equipment Comes of Age*, N.Y. TIMES (Sept. 27, 1981), *archived at* https://tinyurl.com/bnt57hvy.
[9] Sandra Salmans, *The Interactive World of Toys and Television*, N.Y. TIMES (Oct. 4, 1987).

20. These technologies blurred the line between video games and movies. As one commentator noted, "more and more movies look and sound like video games, and now that more and more video games look and sound like movies, it seems possible that the new art form might well swallow up the old."[10] By 1982, video games were distributed "in the record and video stores[,]"[11] and by 1983, 400 games were in circulation, "including several controversial X-rated games and a game based on the television series 'M-A-S-H,' in which the uplifting goal is to take the most wounded soldier to a hospital."[12]

21. The evolution of interactive content from laser discs and VHS tapes to modern digital platforms has pushed the boundaries of gaming platforms. Today, video games include the same audio-visual materials found in traditional laser discs and VHS tapes that the VPPA seeks to protect.

### *Defendant is a Video Tape Service Provider*

22. Defendant sells video games containing cinematic cutscenes.

23. Defendant has consumers, in the form of individuals who (a) purchased video games; and/or (b) other merchandise from Defendant; and/or (c) watched prerecord videos on Defendant's Website; and/or (d) subscribed to Defendant's website by at a minimum, providing their IP address and email address; and/or (e) created an account on Defendant's website by at a minimum providing their IP address, email address and name.

### *Defendant Knowingly Discloses Consumers' PII To Third Parties*

24. When customers request, view or purchase audiovisual content from Defendant's

---

[10] Vincent Canby, *Are Video Games About to Zap the Action Movie*, N.Y. TIMES (May 15, 1983*), archived at* https://tinyurl.com/5fv5s6v3.
[11] Aljean Harmetz, *Hollywood Discovering Video Games*, N.Y. TIMES (July 1, 1982), *archived at* https://tinyurl.com/mvcaswf2.
[12] Aljean Harmetz, Makers *Vie for Millions In Home Video Games*, N.Y. TIMES (Jan. 13, 1983), *archived at* https://tinyurl.com/5n84ccc3.

Website or Apps, their Personal Viewing Information is transmitted to Facebook, and other unauthorized third parties as a result of the tracking tools that Defendant purposely installed and implemented on its Website and Apps. Defendant controlled its Website, Apps, and all of the tracking technologies that it used to transmit its customers' Personal Viewing Information to unauthorized parties. Importantly, Facebook would not have received Plaintiffs' or the Class Members' Personal Viewing Information but for Defendant's decision to install and use Facebook's Business Tools, including the Facebook Pixel and Conversions API,[13] and other tracking technologies on its Website and Apps.

25. Moreover, Defendant controlled which data was tracked, recorded, and transmitted when its customers requested or viewed its video content.

26. Defendant's knowledge as to its conduct is evidenced by the fact that: (1) it chose to track its customers' interactions with the Website and Apps, including their purchases of audio visual materials such as video games; (2) it requested and installed lines of code that achieved this purpose; (3) it obtained the lines of code from Facebook and other third parties in order to achieve this purpose; and (4) it controlled the information that was tracked, recorded, and transmitted via the Website and the Apps.

**Defendant's use of Facebook Business Tools and Tracking Pixels**

27. Facebook is a real identity platform, meaning that users are allowed only one account and must share the name they go by in everyday life. To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

28. Businesses, such as Defendant, use Facebook's Business Tools to monitor and

---

[13] Notably, the Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its consumer's viewing information directly from its web server to Meta's web servers. Additional copies of this information are also communicated through the use of cookies.

7

record their website and app visitors' devices and specific activities for marketing purposes.

29. More specifically, the Facebook pixel that Defendant installed and used tracked, recorded, and sent Facebook its customers' granular Website and Apps activity, including the names of specific video games and other audio visual content that customers requested and/or viewed each time through Defendant's Website and Apps. The information is not merely metadata.

30. Defendant's motivation for using the Facebook Pixel and related Facebook Business Tools is simple—it financially benefits Defendant in the form of advertising and information services that Defendant would otherwise have to pay for.

31. The information Facebook receives from Defendant identifies customers based on their unique and persistent Facebook IDs ("FID"), which is sent to Facebook as one data point alongside the title of the audio visual material the specific customer requested or purchased.

32. Notably, these marketing tools are not required for Defendant's Website or Apps to function properly. Even if it finds the tools helpful, it could have used them in a manner that does not reveal its customers' Personal Viewing Information.

33. Any ordinary person who comes into possession of a Facebook ID can easily use that information to identify a particular individual and their corresponding Facebook profile, which contains additional information such as the user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests, and more.

### *Defendant's Use of Tracking Tools*

34. When Defendant's customers purchase, request or view audio visual content on

8

Defendant's Website, the specific title of the video or video game is transmitted to Facebook alongside the customers' persistent and unique Facebook identifiers, thereby revealing their Personal Viewing Information to Facebook. However, customers are unaware of this because, amongst other things, Defendant's transmissions are completely invisible to ordinary customers viewing Defendant's webpages.

35. While Figure 1 shows what ordinary customers see on their screens as they use the Website, Figures 2 shows how Defendant sends to Facebook Plaintiffs and the Class Members PII along with the title of the video game that a customer requested or purchased through the Website.



*Figure 1. The image above is a screenshot of what a consumer sees when they attempt to purchase a video game on Defendant's Website. The page does not contain any logos or indications that their interactions are recorded and sent to Facebook.*



*Figure 2. The images above represent a screenshot of a network traffic report that was taken when a customer attempted to purchase a video game from Defendant's Website, at which time the personal viewing information was transmitted to Facebook.*

36. Upon information and belief, Defendant also transmits its customers' Personal Viewing Information to other unauthorized third parties – including Google, TikTok and Twitter – through other tracking technologies installed on its Website and Apps.

37. The Personal Viewing Information that Defendant obtained from Plaintiffs and the Class Members is valuable data in the digital advertising-related market for consumer information.

38. At no point did Plaintiffs or the Class Members consent to Defendant's disclosure of their video viewing or video game purchase history to third parties. As such, Defendant deprived Plaintiffs and the Class Members of their privacy rights and control over their personal information.

39. The harms described above are aggravated by Defendant's continued retention and commercial use of Plaintiffs' and the Class Members' personal information, including their private video viewing histories.

## **CLASS ACTION ALLEGATIONS**

40. Plaintiffs bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in the United States who, during the maximum period of time permitted by law, used Defendant's Website or Apps to view, purchase, or request prerecorded audio visual materials using their mobile or computer browsers.

41. The Class does not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

42. Plaintiffs reserve the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

43. ***Community of Interest***: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

44. ***Numerosity***: While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, upon information and belief, members of the Class number in the millions. Members of the Class may also be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

45. ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individuals of the Class. These common legal and factual questions include, but are not limited to:

    (a)      Whether Defendant collected Plaintiffs and the Class Members' PII;

    (b)      Whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

    (c)      Whether Defendant's disclosures were committed knowingly; and

    (d)      Whether Defendant disclosed Plaintiffs' and the Class Members' PII without consent.

46.      ***Typicality:*** Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, requested and purchased an audio visual material, in the form of a video game, on Defendant's Website and had their PII collected and disclosed by Defendant to third parties.

47.      ***Adequacy***: Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class because Plaintiffs has no interests which are adverse to the interests of the members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained skilled and experienced counsel.

48.      Moreover, the proposed Class can be maintained because it satisfies both Rule 23(a) and 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members and a Class Action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

    (a)      The expense and burden of individual litigation makes it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action;

    (b)      If separate actions were brought by individual members of the Class, the resulting

duplicity of lawsuits would cause members of the Class to seek to redress their claims other than through the procedure of a class action; and

(c)     Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

49.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

50.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

51.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of selling and delivering audiovisual materials—including video games with cinematic cut scenes that Plaintiffs and the Class Members requested and purchased on the Website and Apps—and those deliveries affect interstate or foreign commerce.

52.     As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiffs and the Class Members are "consumers" because they:

   a. Purchased games from Defendant;

    b. Created an account with Defendant by providing at a minimum, their first and last name, IP address and email address, then purchased, requested and/or viewed audio visual materials;

    c. Subscribed to Defendant's newsletter by providing at a minimum, their ip address and email address; and/or

    d. Made a purchase from Defendant's store through Defendant's Website.

53. Defendant knowingly caused Plaintiffs' and the Class Members' Personal Viewing Information, as well as the above-referenced unique identifiers, to be disclosed to third parties, such as Facebook. This information constitutes "personally identifiable information" under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiffs and Class member to third parties as individuals who purchased or requested audiovisual materials from Defendant. This information allowed third parties, such as Facebook, to identify each Plaintiffs' and Class Member's specific video viewing preferences and habits.

54. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" and (2) "at the election of the consumer…is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent from Plaintiffs and the Class Members under this definition.

55. Defendant was aware that the disclosures to third parties that it shared through the tracking software that it incorporated in its Website and Apps identified Plaintiffs and the Class Members. Indeed, Facebook publicly touts its ability to connect PII to individual user profiles. Defendant also knew that Plaintiffs' and the Class Members' Personal Viewing Information was disclosed to third parties because Defendant programmed the tracking software into the

Website's and Apps' code so that third parties would receive the video game titles and consumer's unique third-party identifiers when a consumer requested and/or purchased a videos or other prerecorded audio visual material on the Website or Apps. The purpose of those trackers was to obtain identifiable analytics and intelligence for Defendant about its user base, while also benefiting Facebook and other third parties, by providing them with additional data that they can leverage for their advertising, analytics and/or other services.

56. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Website's and app's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

57. On behalf of Plaintiffs and the Class Members, Plaintiffs seeks declaratory relief, statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c), and reasonable attorneys' fees and cost.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant as follows:

   a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Class, and Plaintiffs' Counsel as Class Counsel;
   b) For an order declaring that Defendant's conduct violates each of the statutes referenced herein;
   c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;
   d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;
   e) For prejudgment interest on all amounts awarded;
   f) For an order of restitution and all other forms of equitable monetary relief;
   g) For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

15

## **JURY TRIAL DEMANDED**

Plaintiffs demands a trial by jury on all claims so triable.

Dated: May 7, 2025                **GUCOVSCHI ROZENSHTEYN, PLLC.**

By: ___/s/ Adrian Gucovschi___
Adrian Gucovschi, Esq.

Adrian Gucovschi
Benjamin Rozenshteyn
Nathaniel Haim Sari (*pro hac vice* forthcoming)
140 Broadway, FL 46
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com
    ben@gr-firm.com
    nsari@gr-firm.com

**LEVI & KORSINSKY, LLP**
By: */s/ Mark S. Reich*
Mark S. Reich (MR-4166)
Michael N. Pollack (6173272)
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
    mpollack@zlk.com

*Attorneys for Plaintiffs and the Putative Class*